**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Josiah Clark, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19 CV 7131 |
| | ) | |
| v. | ) | (Consolidated with 21 CV 3093) |
| | ) | |
| Cook County Sheriff's Office, et al., | ) | Honorable Judge Alonso |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Local Rule 56.1(b) Additional Statement of Undisputed Material Facts**

Plaintiff Josiah Clark, through his attorneys Hale & Monico, respectfully submit his additional statement of undisputed material facts pursuant to Local Rule 56.1(b). In support, Plaintiff states:

1. Officer Perry was assigned to 08 RTU on Tier 3F from between 11:00 PM on June 8, 2019 through 7:00 AM on June 9, 2019. Officer Perry's duties as a tier officer include being present to watch over the detainees to make sure that there were no fights or arguments. *Deposition of Defendant Kardell Perry* (*Dkt. No. 114-5*) ("*Perry Dep*") at 20: 17-20, 43: 20-24, 44: 1-2.

2. Tier 3F is a dorm setting where the correctional officers sit at their own desk near the door of the tier. *Perry Dep* at 22: 7-14.

3. Typically, an outgoing tier officer will relay information to the oncoming tier officer, including whether two inmates had been involved in an argument; this includes a verbal argument. *Perry Dep* at 48: 18-24, 49: 1-15.

4. When an oncoming tier officer is informed of a prior verbal argument between two inmates, they are not required to make a record of that information; a report must only be created if the altercation elevated to a physical one. *Perry Dep* at 49: 16-24, 50: 1-11.

5. Per Cook County Sheriff Office policy, officers assigned to monitor tiers are allowed to

leave the tier while on shift. *Perry Dep* at 26: 6-18.

6. Officer assigned to those tiers are only required to get approval to leave the tier if they are taking a break longer than ten minutes. *Perry Dep* at 26: 23-24, 27: 1-4.

7. When officers intend to leave the tier unsupervised for less than ten minutes, they are not required to obtain permission from a supervisor but only ask an officer (relief officer) in a close location to watch their tier. *Perry Dep* at 28: 2-11.

8. According to Officer Perry, it is then incumbent on the relief officer to watch the tier, which can be done from the outside of the tier. *Perry Dep* at 29: 13-24, 30: 1-8.

9. Tier officers are also, at times, required to watch multiple tiers at the same time. *Perry Dep* at 30: 12-19.

10. Tier officers are not required to document when they leave or return to the tier. *Perry Dep* at 32: 22-24, 33: 1-7.

11. Inmates assigned to the RTU can have canes, crutches, and wheelchairs. *Perry Dep* at 36: 4-6.

12. Officer Perry only recalled leaving the 3F Tier one time during his shift but does not recall the reason he left the tier unmonitored. *Perry Dep* at 50: 18-24, 51: 1-7.

13. Officer Perry entered Tier 3F at approximately 10:57. Officer Perry and the outgoing Tier Officer had a brief conversation; Officer Perry does not recall what he was told. *Perry Dep* at 56: 1-8, 57: 3-15; *03-039 Video* (Exhibit "1") at 10:57:15-10:56:29;[1] *03-036 Video* (Exhibit "2") at 10:57:15-10:56:29.[2]

14. Between 11:30 PM and 12:10 AM, Officer Perry left Tier 3F five times: 11:30

[1] This video must be played in the Genetec Player.
[2] This video must be played in the Genetec Player.

(approximately one minute), 11:45 (approximately three minutes), 11:49 (approximately six minutes), 12:00 (approximately eight minutes), 12:10 (approximately four minutes). *Perry Dep* at 57: 16-24, 58: 11-22,59: 17-20, 60: 1-21, 61: 2-9; *Exhibit 1* at 11:30:15-12:14:20; *Exhibit 2* at 11:30:15-12:14:20.

15. Officer Perry is unable to identify who was monitoring Tier 3F after he left the tier and does not know if he continued to monitor the tier from the window once he left. *Perry Dep* at 61: 15-23, 66: 9-12.

16. Between 12:12:09 and 12:13:02, Jacorey Barksdale removed the arm of a wheelchair belonging to another inmate and placed it near his bed. *Perry Dep* at 64: 22-24, 65: 1-7; *Exhibit 2 2* at 12:12:09-12:13:02.

17. Jacorey Barksdale removed the wheelchair arm during a time Officer Perry had left the tier. *Perry* at 65: 8-13; *Exhibit 2* at 12:10:24-12:14:20.

18. Between 12:27:10 to 12:29:18, Barksdale picked up the wheelchair arm he had previously removed and struck Josiah Clark in the head multiple times. *Perry* at 68: 23-24, 69: 1-17; *Exhibit 2* at 12:27:10 to 12:29:18; *Video-PLTF 3068* (Exhibit "3") at 12:27:10 to 12:29:18; *Video-PLTF 3069* (Exhibit "4") at 12:27:10 to 12:29:18.

19. After he attacked Plaintiff, Barksdale put the wheelchair arm on the ground and informed Officer Perry that he had struck Plaintiff. *Perry Dep* at 69: 21-24, 70: 3-7.

20. Due to the attack by Barksdale, Plaintiff suffered intracranial hemorrhage, subarachnoid hemorrhage, and a penetrating head trauma on the left side with a depressed skull fracture and orbital fracture. He underwent urgent lifesaving craniectomy and had to undergo a second surgery to repair the defect in his skull. *Syed Rizvi Deposition* (Exhibit "5") at 90: 14-19; *Dr. Rizvi Report* (Exhibit "6") at 5.

21. Between May 30, 2015 and Plaintiff's attack on June 9, 2019, there were 16 other incidents in which an inmate used a portion of a wheelchair as a weapon that were documented:

1) On May 30, 2015, an inmate attempted to remove a wheelchair arm to use as a weapon in an altercation with another inmate.
2) On July 8, 2015, an inmate removed a wheelchair arm and attempted to attack another inmate using the wheelchair arm as a weapon.
3) On August 15, 2015, an inmate removed a wheelchair arm and attempted to attack another inmate using the wheelchair arm as a weapon.
4) On May 24, 2016, an inmate removed a wheelchair arm and attempted to attack another inmate using the wheelchair arm as a weapon; the aggressor eventually threw the wheelchair arm at the second inmate and caused injury.
5) On June 4, 2016, an inmate removed a footrest from his wheelchair and threatened to attack another inmate with the weapon.
6) On August 28, 2016, an inmate removed a wheelchair arm and arm and attempted to attack another inmate using the wheelchair arm as a weapon.
7) On October 16, 2016, an inmate removed a detachable part from a wheelchair and used it as a weapon against another inmate, causing injury.
8) On November 17, 2016, an inmate removed a detachable part from a wheelchair and attempt to use it as a weapon against another inmate.
9) On January 7, 2017, an inmate removed a detachable part from a wheelchair and used it as a weapon against another inmate, causing injury.
10) On September 3, 2017, an inmate removed a detachable part from a wheelchair and used it as a weapon against another inmate, causing injury.
11) On May 20, 2018, an inmate removed a wheelchair arm and used it as a weapon against another inmate, causing injury.
12) On July 15, 2018, an inmate removed a wheelchair arm and used it as a weapon against another inmate, causing injury.
13) On July 23, 2018, an inmate removed a wheelchair arm and attempted to use it as a weapon against another inmate.
14) On August 23, 2018, an inmate removed a wheelchair arm and attempted to use it as a weapon against another inmate.
15) On December 26, 2018, an inmate removed a wheelchair arm and attempted to use it as a weapon against another inmate.
16) On May 13, 2019, an inmate removed a detachable part from a wheelchair and attempted to use it as a weapon against another inmate.

*Martha Yoksoulian Deposition* (Exhibit "7") at 41: 19-24, 42: 1-19, 45: 5-20;[3] *Documented Prior*

---

[3] Marha Yoksoulian was designated pursuant to Federal Rule of Civil Procedure 30(b)(6) by the Cook County Sheriff's Office to testify on "The Cook County Sheriff's Office notice about the use of wheelchair parts as weapons by individuals detained at the Cook County Jail from January 1, 2013 through December 31, 2020." *Rule 30(b)(6) subpoena Rider* (Exhibit "14").

*Incidents-CLARK-SHERIFF* 05390-05394 (Exhibit "8") at.

22. The Cook County Sheriff's Officer has a notification system in place when there is an incident or emergency at the Jail, including inmate violence: the officer on scene will notify their immediate supervisor, the supervisor will notify the lieutenant/watch commander, the watch commander will notify the administrative officer (AO) and the superintendent. *Exhibit 7* at 15: 18-24, 16: 1-19.

23. According to Martha Yoksoulian, the use of wheelchair parts as weapons by detainees as set forth in Additional Statement of Fact Number 21 would have gone through the notification process set forth in Additional Statement of Fact Number 22. *Exhibit 7* at 44: 24, 45: 1-4.

24. On March 14, 2017, the Chicago Sun-Times published a story entitled Cook County's inmates in wheelchairs face challenges and pose risks in jail. The story referenced an incident in which two inmates dismantled their wheelchairs, turned parts into weapons (including the removal of a handrail) and "bludgeoned a third inmate they had argued with, sending him to the hospital with a head injury." Daniel Moreci, assistant executive direct of the jail under Cook County Sheriff Thomas Dart was interviewed and reported as saying that "[g]uards are on constant lookout for weapons that inmates fashion from wheelchair parts."[4] *Chicago Sun-Times Article-PLTF 3182-3197* (Exhibit "9").

25. Sabrina Rivero-Canchola testified that the Cook County Sheriff's Office has a "weapons-free committee" that meets monthly to identify items inmates used as weapon, including medical equipment and will have discussions with Cermak to determine if there are alternatives to the medical equipment in use. The membership of these meetings can include executive directors and

[4] This quotation is taken from the story itself as what Moreci relayed but is not a direct quote from Moreci himself.

jail superintendents. *Deposition of Sabrina Rivero-Canchola* (*Dkt. No. 114*-6) ("*Rivero-Canchola Dep*") at 26: 18-22, 27: 11-20, 28: 11-23.[5]

26. The "weapons-free committee" has never contacted Rivero-Canchola to discuss feedback on wheelchairs or potential alternatives. *Rivero-Canchola Dep* at 29: 6-8.

27. In approximately 2023, meetings were held to specifically discuss the use of medical equipment as weapons by inmates; wheelchairs were never discussed during those meetings. *Rivero-Canchola Dep* at 29: 9-16, 30: 1-3.

28. Rivero-Canchola has never been part of any meeting to discuss the types of wheelchairs used by the Cook County Jail following any incident in which an inmate used a wheelchair part as a weapon and is not aware of anyone at the Cook County Sheriff's Office who has held such a meeting. *Rivero-Canchola Dep* at 44: 1-11.

29. The Cook County Sheriff's Office "doesn't have a policy on what wheelchairs are permitted at the Cook County Sheriff's Office" and does not have any policies regarding the types of medical equipment that is permitted to be used by inmates at the Cook County Jail. The Cook County Sheriff's Office does not have a policy that only correctional-facility safe or tamperproof wheelchairs can be issued to inmates or detainees. *Rivero-Canchola Dep* at 15: 23-24, 16: 1-20, 19: 12-24, 20: 1-6.

30. Rivero-Canchola searched for alternative wheelchairs to be used in the Cook County Jail

---

[5] Sabrina Rivero-Canchola was designated pursuant to Federal Rule of Civil Procedure 30(b)(6) by the Cook County Sheriff's Office to testify on "The policy of the Cook County Sheriff's Office as it pertains to the type(s) of wheelchairs permitted to be used by individuals detained at the Cook County Jail from January 1, 2013 through December 31, 2020" and "The Cook County Sheriff's Office notice about the availability to purchase specialized wheelchairs designed for use in correctional facilities from January 1, 2013 through December 31, 2020. Specifically, the notice about the availability to purchase wheelchairs that are designed to preclude any disassembly by detainees." *Exhibit 14*.

one time, in 2015, but found the wheelchair inadequate. Since 2015, she has not searched for any alternative wheelchairs to be used by inmates at the Cook County Jail. *Rivero-Canchola Dep* 35: 8-17.

31. Cook County Sheriff's Office Policy 303 requires that an officer assigned to monitor a dormitory with multiple inmates is required to be in direct visual and oral contact with the inmates. *Larry Gavin Deposition* (Exhibit "10") at 14: 7-14;[6] *Policy 303* (Exhibit "11").

32. Policy 303 states "[s]uch sworn members must not lead their assignment until properly relieved while inmates are present and should not be assigned duties that could conflict with the supervision of inmates." Policy 303.3; *Exhibit 10* at 16: 6-20; *Exhibit 11*.

33. Policy 303 further states "[s]worn members shall continuously observe, excluding monitoring devices, dormitories that house more than 25 inmates." Policy 303.3.1 does not allow for a sworn member to leave a dormitory unmonitored or unsupervised without being relieved. The RTU dormitories typically house more than 25 inmates. *Exhibit 10* 20: 22-24, 21: 1-8, 22: 10-15; *Exhibit 11*.

---

[6] Larry Gavin was designated pursuant to Federal Rule of Civil Procedure 30(b)(6) by the Cook County Sheriff's Office to testify on "The Cook County Sheriff's Office policy on Cook County Sheriff's Office policy Section303.1.1 and the policy on when Direct Supervision of detainees is required as opposed to Indirect Supervision," "The Cook County Sheriff's Office policy on when detainees may be left unsupervised by Direct or Indirect means under Cook County Sheriff's Office policy Section 303.3," "The Cook County Sheriff's Office policy on when detainees assigned to a dormitory that house more than 25 inmates may be left unsupervised by Direct or Indirect means under Cook County Sheriff's Office policy Section 303.3.1," "The Cook County Sheriff's Office policy on the use of any surveillance cameras to monitor detainees in dormitories when there is no correctional officer or jail employee conducting Direct Supervision of that dormitory," and "The Cook County Sheriff's Office policy on when the assignment of detainees to a single-person cell or segregation due to threats of violence or prior acts of violence. Specifically, I f there was any such policy in effect in June 2019 as it relates to RTU, Division 8. If such a policy existed, this individual would testify as to what criteria were used to determine whether to assign a detainee in RTU, Division 8 to a single-person cell or segregation due to threats of violence or prior acts of violence." *Exhibit 14*.

34. The actual policy of the Cook County Sheriff's Office (Cook County Department of Corrections) is that, at times, sworn members may be assigned duties that could result in inmates in dormitories not being directly supervised. *Exhibit 10*, 24: 4-11.

35. Sworn members also may leave their assignment if permitted to do so by their supervisor even if no sworn member provides relief, which will leave the dormitory unsupervised during that time period. *Exhibit 10*, 29: 15-22.

36. The Cook County Sheriff's Office does not have a policy that governs when inmates are assigned to single-person or single-occupant cells. There is no written policy on when an individual should be assigned to a single-occupancy cell despite committing multiple incidents of violence towards other inmates. *Exhibit 10* at 33: 3-5, 34: 15-21.

37. Plaintiff's retained expert Lenard Vare rendered four opinions in this case:

1) **Cook County Sheriff's Office and the staff working at the Cook County jail facilities were aware of the serious concerns related to inmates misusing wheelchairs and tearing up parts to make weapons and using such parts to carry out assaults on others. Staff in executive positions at Cook County testified that they had no knowledge about the severity of the issue and even claimed that they were unaware of the numerous incidents involving wheelchairs and inmates using these devices as weapons. Steps were not taken to mitigate the risks even after having years of data and information regarding the misuse of wheelchairs by inmates. Although the facility had an ADA Compliance Officer, the individual did not follow policy in considering the risks posed by the continued use of the unsafe wheelchairs or recommending a change in procedures that would have allowed for a safer operation of the jail. The failure of the Cook County Sheriff's Office to implement a policy that precluded the use of wheelchairs that could be dissembled into weapons, despite the prior incidents in which the parts were used as weapons and the high risk created by the lack of such a policy was obvious, exhibited an indifference to the needs of the detainees and was the moving force behind Barksdale's use of a wheelchair arm to attack Plaintiff.**
2) **Cook County allowed the custom and practice of permitting corrections officers to abandon their direct supervision housing units while they took breaks without having proper relief in place. Officers were asked to watch more than one unit at a time by standing outside in the hallways even though there was a mandate to never allow a housing unit with over 25 detainees to be left unsupervised. The requirement for continuous observation was not followed, creating an unsafe environment at the jail.**
**As a result of the customary practice of permitting officers to take small breaks or leave the housing unit unattended, Officer Perry left his post unattended for several minutes and took breaks on the night of the attack on plaintiff Mr. Clark. During one of these**

**absences, inmate Barksdale was able to remove a wheelchair arm from another inmate's chair and hide it under his sheets on his bed. The item was subsequently used in the attack on Mr. Clark.**

3) **Cook County jail failed to follow sound corrections practices through proper classification methods. Classification processes used at the jail did not consider risk factors when mixing inmates with various levels of criminal backgrounds and criminal sophistication into a single housing unit. This was done to consolidate inmates with medical and mental health issues all into fewer sections of the jail. This practice is not practical because it created failures in inmate classification and contributed to the attack on Mr. Clark.**

   **Cook County Classification Unit also failed to appropriately remove inmate Barksdale from the dormitory-style housing area as he was scheduled to be placed into a segregated cell on June 8, 2019, after he threatened to kill a corrections officer. This move in housing never took place. Had he been moved to an appropriate location away from Mr. Clark, he would never have had the opportunity to carry out the vicious attack on Mr. Clark.**

4) **The classification process at the Cook County jail places an enormous level of priority on recommendations made by Cermak in making housing decisions. By abdicating other very important factors in housing and classification decision-making, the facility has ignored known risks and ongoing threats from very dangerous individuals in the name of complying with ADA standards. This approach to compliance with ADA standards is flawed because many individuals who use wheelchairs are forced to deal with others who will commandeer parts from the wheelchairs to use as weapons.**

*Deposition of Lenard Vare* (Exhibit "12") 182: 4-10; *Expert Report of Lenard Vare* (Exhibit "13") at 39-48.

Respectfully submitted,
*/s/ Shawn W. Barnett*
Attorney No. 6312312

**Hale & Monico, LLC**
53 West Jackson, Suite 334
Chicago, IL 60604
HaleMonico.com
sbarnett@halemonico.com
312-870-6905

**Certificate of Service**

I, the undersigned attorney, certify that I caused the foregoing to be filed with the Court using the Court's electronic filing system. As a result, copies of the filed document were electronically served upon all counsel of record.

*/s/ Shawn W. Barnett*