EXHIBIT
A Vare 060624
exhibitsticker.com

CARSEL & AYVES, Inc.
Jail and Prison Consulting

March 28, 2024

Shawn Barnett, Esq.
Hale & Monico, LLC
Chicago, IL 60604

Regarding: Expert Review in the matter of:

**Josiah Clark**
**v.**
**Cook County Sheriff's Office, Correctional Officer Perry, Sheriff Dart, and Cook County, Illinois**

**Case No.: 19 CV 7131**

**United States District Court- Northern District of Illinois – Eastern Division**

I have reviewed the above-stated case on behalf of the plaintiff. I have had the opportunity to examine all the documents provided to me related to this matter and have formed opinions based upon my knowledge, education, expertise, and experience in managing correctional facilities and inmate populations.

## I. INTRODUCTION

I have over 26 years of experience working in jails and prisons. I have been a senior warden at three state prisons in the state of Nevada and have worked at all levels of inmate classifications including both male and female correctional institutions. I have experience working in minimum custody and community corrections facilities to maximum custody institutions with death-row inmates.

I have served as the chairperson over the County parole board making risk-factor based decisions on inmate parolees.

Beginning in 2008, I served as the jail director and corrections administrator over the Napa County Department of Corrections for 10 years before retiring from public service. I then served as the Chief Operating Officer for an international inmate electronic monitoring company that also provided community corrections programs in juvenile facilities and county jails. Between 2020 – 2021, I served as an investigator for the California State University, Sacramento conducting personnel investigations and Title IX complaints.

I was certified as a Hostage/Crisis Negotiator through the Public Safety In-Service Program under the Southeastern Public Safety Institute (SEPSI) and the Federal Bureau of Investigations' Hostage Negotiations Training program and served as a hostage and crisis negotiator while working for the Nevada Department of Corrections.

I hold a bachelor's degree in criminal justice administration and a master's degree in justice management. I have served as an adjunct criminal justice professor for six years and have been involved in training various sheriff's and probation departments on topics related to corrections and inmate management.

I have considerable experience in the topic of deaths in-custody, and suicidal deaths in-custody, conducing suicide/death investigations and homicide investigations in a correctional setting and overseeing Critical Incident Teams following deaths in custody. I have been retained by both the plaintiffs and the defendants in jail and prison litigation cases in over two dozen states as a corrections expert for the past six years.

I approach the review of a case from the standpoint of acceptable standards as they relate to policies and procedures, mandates, and, where reasonable and appropriate, best practices from my years of training and experience with these issues. If called to testify, I would be able to offer testimony related to this matter as a corrections expert and consultant. My opinions are formed based on my education, knowledge, and experience, and from the perspective of a former prison

warden and jail administrator, the review of materials provided to me, and my own supplemental research as necessary.

## II. DEPOSITION AND TRIAL TESTIMONY

The following is a list of cases in which I either testified as an expert at trial or deposition within the past five years:

- *Jones v. Kuppinger, et. al. California* (2019). Provided deposition testimony.
- *Woodward v. County of San Diego, et al.* (2019). Provided deposition testimony.
- *Belden v. County of San Bernardino, et al.* (2020). Provided deposition testimony.
- *Bestafka v. County of Kings, California* (2020). Provided deposition testimony.
- *Sugamosto v. The Geo Group, New Mexico* (2021). Provided deposition testimony.
- *Arnold v. CoreCivic* (2021). Provided deposition testimony.
- *Brooks v. CoreCivic* (2021). Provided deposition testimony.
- *Smith v. CoreCivic* (2021). Provided deposition testimony.
- *Hector Hernandez v. County of Alameda* (2021). Provided deposition testimony.
- *Mkrtchyan v. County of Sacramento, CA* (2021). Provided deposition testimony.
- *Hendrix v. Kingfisher County Sheriff's Office, OK* (2022). Provided deposition testimony.
- *Guadalupe Cantu v. TJJD, Texas* (2021). Provided deposition testimony.
- *Hall v. State of Maryland* (2022). Provided deposition testimony.
- *Seay v. CoreCivic* (2022). Provided deposition testimony.
- *Anaya-Wilson v. CoreCivic* (2022). Provided deposition testimony.
- *Blodgett v. State of Arizona* (2022). Provided deposition testimony.
- *Higgins v. San Bernardino County, CA* (2022). Provided deposition testimony.

- *Equlla Bros. v. Board of County Commissioners, OK City* (2022). Provided deposition testimony and testified at trial in federal court in 2023.
- *Johnson v. Tanya Adams, South Carolina* (2023). Provided deposition testimony.
- *Pulley v. Heartland Center, Missouri* (2023). Provided deposition testimony.
- *Thorpe v. Virginia Department of Corrections* (2023). Provided deposition testimony.
- *Hayes v. Kern County, California* (2023). Provided deposition testimony.

## III. ORIGIN OF ACTIVITY AND METHODOLOGY

Plaintiff Josiah Clark's complaint arises from an incident on or about June 9, 2019, while he was in the care and custody of the Cook County Jail in the State of Illinois, where he was being held as a pre-trial detainee. While housed at the jail, Clark was severely assaulted by another detainee named Jacorey Barksdale.

Barksdale had removed a wheelchair arm belonging to another inmate and hidden it in his bunk. After approximately 15 minutes, Barksdale used the wheelchair arm as a weapon and struck Clark in the head at least four times. The attack took place a few minutes past midnight and Clark had been asleep in his bunk at the time. The serious injuries to Clark included a gash under his left eye and a hole in his head. Clark remained unconscious for a prolonged period and suffered a traumatic brain injury.

Plaintiff alleges that the actions of Barksdale were observable on the tier surveillance video camera, which recorded the attack on Clark. According to the plaintiff, Barksdale had already committed at least seven previous acts of violence while he was in custody at the Cook County jail before he attacked Clark on June 9, 2019. Some of these attacks by Barksdale were on other detainees without cause.

Plaintiff claims that on the day before Barksdale attacked him, Barksdale had threatened to assault a staff member stating, "*in the world, I would have killed you*." Despite this incident and

others in which Barksdale threatened to kill another person, he was permitted to be on a multi-inmate tier and not confined to a single person cell.

Plaintiff alleges that correctional officer Perry had been assigned to monitor the housing unit RTU/3F between the hours of 2300 and 0700. Perry was responsible for the safety and security of individuals housed on that tier. Plaintiff believes that Perry had an obligation to protect the detainees from an attack by Barksdale and he failed to take any remedial steps to remove the weapon from Barksdale's possession.

Plaintiff claims that the risk of wheelchair parts being turned into weapons was known to the defendants. In approximately July 2017, two detainees at the jail removed wheelchair arms and turned the parts into weapons which were then used to attack a third detainee causing injuries. The Sheriff's Office also produced documents showing that between May 2015 and June 2019, there had been at least sixteen incidents at the jail in which a detainee had used a portion of a wheelchair as a weapon against another detainee[1]. Many of those incidents involved the detainee detaching the arm of the wheelchair in the same manner Barksdale used to detach the wheelchair he used as a weapon against Plaintiff.

Cook County sheriff Dart failed to implement a policy which would have prevented the use of wheelchairs which could be tampered with, and parts that could be removed to be fashioned into deadly weapons despite these numerous incidents in which detainees used detached parts of the wheelchairs as weapons. There are wheelchairs specifically designed for correctional settings which are tamper-proof and appropriate for use in jails. As the final policymaker for the policies, practices, and customs including all gaps in policy, Sheriff Dart acted with deliberate indifference and consequently the plaintiff was harmed.

---

[1] Clark-Sheriff 5390-5395

## IV. INMATE BARKSDALE'S JAIL RECORDS

I was provided with numerous incident reports and disciplinary actions related to Jacorey Barksdale. For the purposes of my review, I limited my examination to the incidents that occurred prior to June 9, 2019, to evaluate whether Cook County staff knew of the risks associated with Barksdale and if appropriate steps were taken to properly classify and house him.

The following are important events involving Barksdale in which he was involved in a fight, assault, or making threats against others.

**April 16, 2017** - Inmate Barksdale was observed fighting with Inmate Avante Temple in the N-House dayroom. Officer Killeen entered the dayroom to stop the fight and attempted to pull inmate Temple off inmate Barksdale which caused him to fall onto the floor. While on the ground and still attempting to break up the fight Officer Killeen was struck by inmate Barksdale in the head.

Inmate Barksdale was transferred to T-house in Dorm 2 and Inmate Temple was transferred to O-house in Dorm 2. According to the records, Killeen was transported to the hospital. Killeen reportedly wished to file charges against Barksdale for battery on an officer.

**October 6, 2018** - While assigned to RTU tier 3F, an officer instructed in the dayroom to return to their bunks. An inmate named Juan Owens repeated the officer's instructions out loud. Inmate Barksdale confronted Owens and told him, "*You not the police.*" Inmate Owens walked away and went to the restroom. Inmate Barksdale followed Owens into the restroom. An argument started between the two Barksdale struck Owens with a closed fist and the two inmates began to fight. The inmates were separated and removed.

**October 12, 2018** – While housed in RTU tier 3G, detainees Joseph Mathis, Jesse Pinkerton, and Barksdale began to repeatedly punch detainee Marc Birk. Officer Holmes reported being in direct supervision of the tier when the attack occurred. Several officers responded to remove

Birk from the area. Birk reported that he was assaulted because he owed $2.00 in gambling debt and had been unable to pay it back.

When interviewed, Mathis, Pinkerton, and Barksdale would not make any comments regarding the incident. Instead, they stated that they were in fear for their lives from staff in RTU and did not want to be housed in RTU any longer. This could not be substantiated as none of the individuals could report any specific threats from staff and the three aggressors were moved to tier 4A.

**October 16, 2018** - While assigned to RTU tier 4A – Cell #5, Barksdale became involved in a loud argument with his cellmate Lashaun Moore. Two officers approached cell #5 after hearing yelling and witnessed inmates arguing and immediately removed Barksdale to prevent a physical altercation.

**October 30, 2018** – While housed in RTU tier 3D, Barksdale was escorted out of the unit at 2015 hours to be searched. When Barksdale was escorted back, staff had ordered several other inmates in the unit to line up to be searched. Barksdale ran over to detainee William Bornaugh and immediately started striking him with multiple closed fists strikes to the facial area. Staff gave multiple orders to detainee Barksdale to stop, but all orders were ignored. Staff then separated both detainees, handcuffed them, and escorted them both off tier.

**December 18, 2018** – While housed in RTU tier 2C, staff became aware of an incident where Barksdale tampered with the unit's surveillance camera. According to the report, Barksdale had been assigned to 2C – Cell #2316. Barksdale was observed via a stationary camera engaged in twisting the camera with his right hand turning it towards the shower area. Barksdale was issued a disciplinary write-up for tampering with the camera.

**January 23, 2019** – An officer assigned to Division 10, 4D observed multiple inmates hitting someone in the front of the tier. Surveillance video of the incident showed inmates Davis Denzel

standing in front of the tier watching television when inmates Parish McHenry, Devin Robinson, Bouie Keyshaun, and Barksdale walked up. Barksdale appeared to say something and then swung at Davis, hitting him in the face and knocking him down. Inmates Robinson, McHenry, Bouie, and Barksdale then began to punch and kick Davis. At some point Robinson, Bouie and McHenry stopped hitting and kicking Davis and walked away. Barksdale continued to punch Davis. Staff responded and removed Barksdale and Davis from the area.

**April 13, 2019** – While housed in RTU tier 3G, an officer heard a loud thud from the back of the unit. Upon responding he found Barksdale on the floor motionless, appearing to be unconscious. Detainee Semaj Waters was seen on the surveillance camera recording throwing a right hand strike at Barksdale. Later, Barksdale attempted to throw a closed handed fist at Waters in the presence of staff. Both individuals were separated.

**April 13, 2019** – While housed in the RTU tier 3G, an officer witnessed Barksdale throwing sandwich dressing on another inmate. The officer intervened and separated both inmates and escorted Barksdale off the tier.

**June 8, 2019** – Officers Hernandez and Mochocki were working inside the RTU tier 3F. Barksdale approached Hernandez at the officer's desk and rudely asked him for the time. When the officer informed Barksdale that he needed to be polite, Barksdale threatened the officer and said, "*I don't have to, because in the world I would have killed you*." Barksdale was handcuffed and walked off the tier to 3 West Control holding area. Barksdale received a disciplinary citation and officer Hernandez stated that he wanted to press charges against Barksdale for making a threat towards him. A hard copy of the report was sent to Superintendent Yoksoulian.

According to Cook County Sheriff's Office – Inmate Disciplinary Code[2], Barksdale's conduct toward Hernandez would have been considered a level 3 charge and a violation of code 320.

| | | |
|---|---|---|
| 320 | Threat to Staff | A threat made to an employee that causes the employee to believe the inmate intends to cause harm to him/her, another staff member, a family member, or a friend. |

A review of Barksdale's classification document[3] showed that he was identified as a maximum custody inmate. The last classification review prior to Barksdale's attack on Mr. Clark occurred on April 6, 2019. During this review, classification staff member Medina noted that Barksdale was a maximum custody inmate.

| Status | Offender | Classification D | Classification Type | Security Classifi | Classification Ov | Classified By |
|---|---|---|---|---|---|---|
| Inactive | Jacorey Barksdale | 1/29/2021 | Reclass Male | Maximum | No Value | S Duncan |
| Inactive | Jacorey Barksdale | 5/7/2021 | Reclass Male | Maximum | No Value | J Marino |
| Inactive | Jacorey Barksdale | 6/2/2022 | Reclass Male | Maximum | No Value | T Herrera |
| Inactive | Jacorey Barksdale | 6/7/2020 | Reclass Male | Maximum | No Value | D Yousif |
| Inactive | Jacorey Barksdale | 4/6/2019 | Reclass Male | Maximum | No Value | A Medina |
| Inactive | Jacorey Barksdale | 1/31/2020 | Reclass Male | Maximum | No Value | C Waters |
| Inactive | Jacorey Barksdale | 8/4/2019 | Reclass Male | Maximum | No Value | C Sprayberry |

I examined records that included several disciplinary reports related to Barksdale. Included in these records was a computerized classification document. The document did not have a title, but it is in the same format as the classification document shown in the earlier paragraph. Based on this information, I have presumed that the document section included below is also from Barksdale's classification file.

**According to this document[4], Barksdale was classified to "House Alone- Out Alone" status, which was noted to begin on June 8, 2019, and expire on June 22, 2019.**

---

[2] Clark-Sheriff 019305-019333 - 2023.05.15
[3] CCSAO Clark v Sheriff 00255
[4] CCSAO Clark v. Sheriff 00408

| | | | | | | |
|---|---|---|---|---|---|---|
| Inactive | Jacorey Barksdale | Medical | P3 Mental Health Intermediate Housing | 9.03 | 6/20/2019 15:50 | 7/17/2019 12:02 |
| Inactive | Jacorey Barksdale | Security | House Alone- Out Alone | 4.03 | 6/8/2019 3:00 | 6/22/2019 9:00 |

**If the above information is true, then Barksdale should have been placed into a single cell away from other inmates on June 8, 2019. Presumably, this decision was reached following his verbal threats to kill a corrections officer. Yet, nothing in the records indicates that he was moved to a separate location. Had this happened, Barksdale would not have had the opportunity to harm Mr. Clark on June 9, 2019.**

## V. COOK COUNTY'S HISTORY OF PROBLEMS WITH WHEELCHAIRS

Documents produced by Cook County[5] included a summary of events involving inmates using wheelchairs and/or parts from wheelchairs as weapons.

1. **May 30, 2015** – A fight occurred in Division 8, 3 North in which an inmate attempted to take another detainee's wheelchair and attempted to remove the arm from the wheelchair to use as a weapon.
2. **July 8, 2015** - A fight occurred in Division 8, 3H in which one inmate grabbed a cane and struck another inmate. An inmate picked up his medical chair and threw it another inmate and ran around in the dayroom while an inmate gave chase with a wheelchair arm rest.
3. **August 5, 2015** – An inmate housed in a single cell was allowed out for his recreation time. The inmate then entered the day room in Division 8, 3E. An inmate reached for and detached the right armrest of a wheelchair belonging to another inmate and began to chase the first inmate around the day room attempting to strike him.

[5] Clark-Sheriff 005390-005395 - 202

4. **May 24, 2016** – A detainee used the arm rest of his own wheelchair to swing at another detainee in Division 8, 3 South dayroom. The arm rest was used to swing at the detainee several times. The detainee refused to comply with staff orders. Eventually, the detainee with the arm rest threw the item at the other detainee and the officer who was attempting to intercede. The detainee injured by the arm rest had knot on the right side of his face.
5. **June 4, 2016** – An inmate housed in RTU tier 4A was observed spitting at another inmate leading to a fight. One of the inmates removed a footrest from his wheelchair and began to threaten the other individual.
6. **August 28, 2016** – A detainee got into a fight with another detainee in RTU tier 3 North dayroom. One of the detainees took off the metal arm of a wheelchair and began brandishing and swinging it around. Approximately 14 inmates had gathered in a group with several inmates attempting to verbally defuse the potential danger to themselves by asking the detainee with the metal arm to stop swinging the weapon. Force was used to bring this situation under control.
7. **October 16, 2016** – A large disturbance involving multiple inmates occurred in RTU tier 3G. Three separate fights involving several individuals occurred simultaneously. Force was used, including the use of chemical spray to contain the situation. Inmates received cuts and bruises to head, face, and hands. A piece from a wheelchair was identified as being used as a weapon during the attack. However, because the item belonged to another inmate who was not involved and needed the part to use his wheelchair, the item was not confiscated. Some of the inmates were placed in other locations of the jail including one inmate being placed into protective custody status.
8. **November 17, 2016** – A detainee in RTU tier 3F was observed by an officer chasing another inmate with a piece from a wheelchair leg and attempting to strike him. The

officer stopped the individual and grabbed the wheelchair arm and escorted the inmate off the tier.

9. **<u>January 7, 2017</u>** – Two inmates in RTU tier 3C got in a fight and exchanged closed fist punches at each other. Video surveillance review showed that one of the inmates was seen with a metal object, possibly from a wheelchair, and using it to strike the other inmate in the head and body area.
10. **<u>September 3, 2017</u>** – Several inmates were involved in a fight in RTU tier 3W. One inmate reported that three inmates had attacked him with crutches and a wheelchair leg. A broken crutch and wheelchair leg were removed by staff.
11. **<u>May 20, 2018</u>** – An inmate assigned to RTU tier 3C approached another inmate with an arm from his wheelchair in his right hand. He then swung the item striking the other inmate in he left hand area. Superintendent Yoksoulian was notified via email about this incident.
12. **<u>July 15, 2018</u>** – Two inmates assigned to RTU tier 3 West began to fight each other. One inmate hit the other with his arm rest from his wheelchair causing a small laceration to the victim's left upper lip. Staff learned that the argument had started over a conversation related to gang affiliations.
13. **<u>July 23, 2018</u>** – An inmate assigned to RTU tier 3 South was let out of his cell for an appointment. As he approached another inmate, he pushed past the escorting officer and then began to strike the other inmate on the head with a closed fist. The victim did not fight back but covered his face with his harms. The aggressor was reported to have taken out the armrest of his wheelchair to strike the other but was prevented from doing so by responding staff.

14. **<u>August 23, 2018</u>** – Two inmates assigned to RTU tier 3H got into a fight in the bathroom area. A review of the surveillance video showed that one of the inmates was swinging a piece from a wheelchair to either defend himself or to create distance. One inmate was moved to another wing pending disciplinary hearing. Superintendent Yoksoulian was notified via email about this incident.
15. **<u>December 26, 2018</u>** – An inmate assigned RTU tier 3 West was seen swinging the arm support from his own wheelchair at another inmate. The inmate was ordered to stop by an officer. The inmate did not comply. The inmate swung the arm support again at the other individual. The officer grabbed it and pulled it away causing the inmate to fall out of his chair.
16. **<u>May 13, 2019</u>** – Two inmates assigned to RTU tier 3 North were engaged in a fight. **The staff report indicates that no cameras are present on the third floor due to medical concerns.** One inmate was hit with a part removed from a wheelchair causing an abrasion on his left bicep.
17. **<u>June 9, 2019</u>** – The final entry in this document details the incident involving inmate Barksdale's attack on Mr. Clark.

Following the incident related to Mr. Clark being severely injured by inmate Barksdale with the use of a wheelchair a request was made for records and responses regarding the conditions of the jail which led to the assault on Mr. Clark.

**Mr. Joseph Ryan, the Executive Director of Public Relations of the Cook County Sheriff's Office made the following statements regarding wheelchairs at the Cook County jail.** In an email[6] dated August 15, 2019, Mr. Ryan wrote:

[6] 5328-5387 CCSO 1-10

> ***As with everything in the jail, we are constantly reviewing items to try to minimize the chances they could be misused as weapons. Wheelchairs have been a focus of that over the years.*** *However, the reality is we have ADA requirements and medical requirements within the law that we have to follow in that regard. Cermak purchases the wheelchairs and we have not identified another brand of wheelchair that we feel would ultimately reduce the potential for element of it to be misused as a weapon. Anything can be turned into a weapon. For example, detainees who medically need canes or walkers have a right to them and legally we can't take them away strictly for security reasons.*
>
> *The wheelchair arms are detachable in order to move a patient laterally. They come that way and need to be that way.*

A news article titled – ***Cook County's Inmates in Wheelchairs Face Challenges and Pose Risks in Jail*** was used as an exhibit[7] in the deposition of former superintendent Yoksoulian. The article written by Frank Main and dated March 14, 2017, made the following salient points regarding the use of wheelchairs inside the jail.

> *Inside the Cook County Jail, a wheelchair can be a weapon. An inmate in a wheelchair can remove a handrail and turn it into a club. A seat-adjustment handle can be fashioned into a shank. And a shank can be hidden in an inmate's colostomy bag. These are facts everyone knows inside the special units of the jail where men in wheelchairs are held while awaiting trial.*
>
> *Even though many of the inmates can't use their legs, correctional officers in the jail never let down their guard.* ***They got a reminder why in late July[8]: a vicious beating in***

[7] Yoksoulian, Martha - Exhibit 7

[8] Based on the timeline provided in the news article, the incident involving the vicious beating of an inmate by gang members occurred sometime in July 2016. This incident was not flagged by Cook County and included in the list of incidents in the discovery materials in Clark-Sheriff 005390-005395 – 202.

***which two inmates dismantled their wheelchairs and turned the parts into weapons. One took off the small wheel on the front of his chair. The other removed a handrail. Then, they bludgeoned a third inmate they had argued with, sending him to the hospital with a head injury****. The attackers were gang members, police say. The victim, who walks with crutches, wasn't in a gang.*

## VI. <u>COOK COUNTY JAIL POLICIES</u>

Several jail policies and procedures were provided by Cook County. I have considered the following sections that I believe are applicable to my examination of this case.

**<u>Policy 148 – Communication and Interaction with Individuals with Disabilities</u>**[9]

Section 148.3 of the policy notes that the responsibilities of the Americans with Disabilities Act (ADA) Coordinator includes:

- *Developing reports or new procedures or recommending reasonable modifications to this policy.*

**<u>Procedure 705 – Prohibition Against Discrimination on the Basis of Disability Procedure</u>**[10]

Section 705.7 of the procedure identifies:

- *Auxiliary aids to mobility impaired inmates include but are not limited to wheelchairs, walkers, canes or crutches, shower chairs, prosthetic devices, casts, splints or braces, orthotic shoes, or shoe inserts.*
- *Inmates with mobility disabilities shall be permitted to maintain the use of their auxiliary aids as prescribed.*

Section 705.3, 6 identifies the requirements for the Classification Unit. The Classification Unit shall:

---

[9] CCSAO Clark v. Sheriff 005270
[10] CCSAO Clark v. Sheriff 005320 - 005327

- *Defer to Cermak as to the appropriate housing for disabled inmates. If the recommended housing poses a substantial safety or security concern, a classification supervisor shall contact the ADA compliance officer for further directions.*
- *Maintain a list of cells and/or living units that can appropriately accommodate inmates with qualified disabilities.*

Section C of the procedure states:

- *Living unit officers shall familiarize all subjects on the unit with emergency and evacuation procedures. Special instructions and planning shall be made for any subjects with disabilities in the living unit.*
- *If shower chairs or any ADA equipment items are missing or in disrepair, the supply room or living unit officer shall immediately notify his/her immediate supervisor, complete an incident report, and secure a replacement as soon as practicable.*

***Analysis:***

Based on the above policy statements, the ADA Compliance Officer had the responsibility of identifying concerns and recommending reasonable modifications to policy. It was within the scope of this individual's function to have knowledge of the threats posed by equipment such as wheelchairs being dismantled or modified to be used as weapons and then propose changes to the policy to enhance safety and security.

Procedure 705 stresses the need for ensuring that mobility impaired individuals are not denied access to their necessary auxiliary aid devices. Based on my review of the records, there was a tremendous problem with wheelchairs being used by inmates for parts that could be turned into weapons and then using such parts to carry out attacks on others. This indicates that although the staff at Cook County was abundantly aware of the fact that ADA inmates with mobility issues were being denied properly working wheelchairs because of the habitual and

overwhelming number of incidents where these devices were being dismantled resulting in these chairs being unfit for use, no steps were being taken to address the concerns that were known to staff. The procedure also states that the classification staff is allowed to consider substantial safety or security concerns and then reach out to the ADA compliance officer for further directions. Additionally, because classification staff were required to maintain a list of cells and living units that could safely accommodate disabled inmates, it is presumed that inmates in wheelchairs could have been either considered for placement into cells themselves or individuals who posed a threat because of their behavior could be placed away from people with wheelchairs so they could be prevented from taking equipment from disabled inmates to fashion them as weapons.

**Policy 723 – Rehabilitation Units**[11]

Section 7233.3 of the policy states:

Inmates shall be assigned to rehabilitation units for pre-hearing confinement and disciplinary reasons to maintain the safety and security of the Department, members, or other inmates.

- **Disciplinary Unit** - An inmates shall be placed in a Disciplinary Unit upon a finding of guilt of a 300- or 400-level offense. **Additionally, inmates may be placed in this unit before a hearing if he/she is believed to have committed an offense that constitutes a threat to another inmate, member, his/her own safety, or a department order**.

**Policy 708 – Inmate Classification**[12]

Section 708.1 of the policy states that the classification process is designed to identify the appropriate custody level so that an inmate may be held in such a way as to foster a safe and secure department.

---

[11] Clark-Sheriff 019305-019333 - 2023
[12] Clark-Sheriff 019311 - 019316

Section 708.5.2 describes the capacity of the classification unit to override scores.

- The member assigned to Classification has the authority to override the scores when it appears necessary to more appropriately assign housing. The override capability exists to use the member's training and expertise in those instances when the numerical scores are not reflective of the inmate's potential security and health risk. All overrides will be reviewed by a supervisor and are intended to be an exception, rather than the rule.

***Analysis:***

Based on the above policy statements, the Classification unit can place an inmate into a special housing unit separate from other individuals if the inmate is known to have committed an offense that is a threat to another inmate or staff member. This step can be taken prior to the disciplinary hearing because of the safety and security concerns of the facility. Further, the Classification unit can even override Cermak's recommendations if it is believed that the inmate poses a security risk.

**Policy 712 – Inmate Searches**[13]

Section 712.1 of the policy discusses the severe threat posed by weapons and other contraband items.

- *The introduction of contraband, intoxicants or weapons into the department poses a serious risk to the safety and security of members, inmates, and the public. Any item that is not available to all inmates may be used as currency by those who possess the item and will allow those in possession of the item to have control over other inmates.*

***Analysis:***

Based on the above statement, Cook County jail was acutely aware of the threats that were posed by contraband that could be turned into weapons. As it applies to this case, County staff

[13] CCSAO Clark v. Sheriff 005299 - 005307

was aware that wheelchairs and the parts from the wheelchairs were previously used by inmates on numerous occasions as weapons. Not all the inmates assigned to the RTU were issued wheelchairs. According to this policy, staff should have been aware that wheelchairs could have been used as currency by some inmates who possessed them, and in other cases inmates who wished to dismantle parts to use them as weapons would be tempted to take them away from people who were permitted these devices.

**Policy 303 – Supervision of Inmates – Minimum Requirements**[14]

Section 303.1.1 of the policy identifies the two types of inmate supervision at the jail.

- ***Direct Supervision*** - *Direct and continuous supervision of inmates by a sworn member on a 24 dash hour basis. The sworn member shall be in direct visual and oral contact with inmates, without separation by security walls or other barriers.*
- ***Indirect Supervision*** – *Non-continuous direct visual and oral contact with inmates which may include separation by security walls or other barriers.*

Section 303.3 of the policy addresses the expected method for supervision of inmates.

- *There shall be, at all times, sufficient alert sworn members designated to an assignment for the direct or indirect supervision and welfare of inmates, to ensure the implementation and operation of all programs and activities, as required by state law, minimum jail standards, and to respond to emergencies when needed. Such sworn members must not leave their assignment until properly relieved while inmates are present and should not be assigned duties that could conflict with the supervision of inmates.*

[14] CCSAO Clark v. Sheriff 005288 - 005289

Section 303.3.1 of the policy states:

- *One additional sworn member shall be on duty for each floor within the facility that houses 15 or more inmates, except during the midnight shift provided 30-minute checks are performed on floors were sworn members are not assigned.*
- *Sworn members shall continuously observe, excluding monitoring devices, dormitories that house more than 25 inmates.*

***Analysis:***

Based on the above policy statements, Cook County jail was required to have direct supervision over inmates housed in any section of the jail where the dormitory population exceeded 25 inmates. The records show that RTU tier 3F had 39 inmates on the night of Mr. Clark's incident. Per policy, the supervision of this unit could be accomplished with a single sworn officer during the midnight shift. However, the policy also required that the sworn officer had to continuously observe the dormitory and not rely on video surveillance for such observation. Per Cook County's own policy, the direct supervision of inmates could not be accomplished by being separated by security walls or other barriers and the staff member was required to have direct visual and oral contact of individuals under his or her supervision.

The policy also prohibits officers being assigned duties that conflicts with supervision of inmates. From my review of the deposition statements in this report, the officers were routinely allowed to leave their direct supervision posts to go fetch papers for the printer or leave the post unattended for bathroom breaks.

## VII. DEPOSITION TESTIMONY

I reviewed the various deposition statements provided regarding this case. From my examination of these statements, I found the following sections from each of the deponents to be relevant to my analysis of this matter.

**Larry Gavin**

Gavin reported working as one of the First Assistant Executive Directors at the Cook County Sheriff's Office. According to Gavin, the direct supervision of inmates involved having a sworn officer physically present in the immediate area of the inmate population and was maintained on a continuous and 24-hour basis. An indirect supervision process involved the officer being assigned to the living unit but being separated by a wall or a door without necessarily having the ability to hear and see every aspect of the living unit.

**Gavin agreed that departmental Policy 303 required that sworn members must not leave their assignments unless they were properly relieved while inmates were present. The staff were not to be assigned duties that could conflict with the supervision of inmates**. Although Gavin believed that the language in the policy established governance, there were variances allowed in operations that may come into play. Gavin admitted that such operational variances were not identified in Policy 303.

Gavin reported that lunch breaks for staff were pre-planned by the supervisor and there would have been advanced notice when someone needed to be relieved prior to going on a lunch break. **However, if a staff member needed to use the bathroom urgently, and there were no other staff available for proper relief, supervisors would occasionally allow the staff member to go and use the restroom and leave the dorm unsupervised**.

According to Gavin, sworn members assigned to living units or dormitories that house more than 25 inmates, must continuously observe the population in the dormitories that they are assigned to. Per Policy 303.3.1., staff members may not leave a dormitory unmonitored without being relieved. Gavin admitted that the policy did not mention when variances could be made. Gavin agreed that this would apply to the RTU since it typically housed more than 25 inmates. (*Reportedly, RTU had 39 inmates on the date of the incident involving Mr. Clark*).

**According to Gavin, the practice at Cook County was that at times sworn members may be assigned duties such as assisting with the search of another tier resulting in specific inmate dormitories not being supervised**.

Gavin admitted that it was not departmental policy to move an inmate to a single occupancy cell after getting into a physical fight regardless of how many fights that the inmate might have gotten into. Gavin further admitted that there were no policies at the Cook County Department of Corrections which identified specific instances which would necessitate an individual needing to be housed in a single cell. Gavin said that there were no written policies for when the Cook County Department of Corrections could address an inmate who might have had multiple incidents of violence committed against other inmates, which would then require the placement of the inmate into a single occupancy cell. Gavin reported that some individuals who are housed by themselves at the Cook County jail were only placed there on the recommendation of the psychiatric and mental health partner, Cermak health services.

**Kardell Perry**

According to Perry, not everyone in the Residential Treatment Unit had a physical or mental disability. There were some with injuries and some who did not have any injuries at all. Perry said that inmates charged with serious crimes like murder were sometimes housed in a cell and at other times, in a dorm setting. **Perry said that inmates who had committed minor crimes all the way up to inmates who had committed rape or murder could be housed together in the RTU.**

According to Perry, medical personnel determined which inmates with canes, crutches, and wheelchairs could be in the RTU. Perry said that there were five cameras which were monitored by a control room officer. He also stated that the control room had many monitor screens, and it would have been impossible for one person to watch all the cameras simultaneously.

Officers working on the tier have a desk which is located inside the tier. The desk has a computer. The officer assigned to the RTU can ask another officer to watch their tier if they were leaving for a short break without requiring supervisory approval.

**Perry reported that there have been times when a single officer might have been required to watch multiple tiers at once**. Perry admitted that other than the incident involving Mr. Clark, he was aware of only one other incident involving an inmate assaulting another inmate with a removable part of a wheelchair. Perry reported that the other incident happened after June of 2019 and that an inmate had been battered with a part taken off a wheelchair. Perry stated that the inmate had been hit with the leg part of the wheelchair and had suffered a broken nose.

**According to Perry, there was no requirement for staff to record and report instances of inmates having verbal arguments**. When asked if two inmates were clearly raising their voices at each other and saying what appeared to be threating things to each other, Perry said, "No, you don't have to report that." **Perry said that the department did not have a requirement that officers document in the log that they were leaving or coming back to the unit, even for extended breaks which lasted more than 10 minutes.**

Perry recalled that he left one time from the tier on the night of June 9, 2019, when inmate Barksdale attacked Mr. Clark. Perry estimated that when he left the tier, it was usually to go get some papers off the printer which was located down the hall. **Perry admitted that he left the tier five times after he was shown the surveillance video from the night of the incident. Perry agreed that the cumulative total of the time that he was off the tier was approximately 20 minutes. Perry further admitted in his deposition that he was not in the tier at the time that Barksdale removed the arm of a wheelchair and put it on or near his bed.**

When Perry was shown the disciplinary report form (Bates 288 – 289), in which he as the reporting officer documented the incident, Perry reported that he did not fill out the report and had no way of knowing who might have completed the report on his behalf.

**Sabrina Rivero-Canchola**

Rivero-Canchola is a licensed attorney in the State of Illinois. Since 2015, she had been working as the ADA Compliance Officer for the Cook County jail. She reported that the Sheriff's office does not have a policy on what wheelchairs are permitted at the jail. Wheelchairs are considered medical equipment and therefore under the authority of the medical provider – Cermak. Cermak purchases the wheelchairs that are in use at the jail.

Rivero-Canchola said that they had a process for evaluating medical equipment in which a *weapons-free committee* meets every month and when they find weapons in the environment that they believe may have come from medical equipment they have a process for discussing that with Cermak and seeing if they can come up with a safer alternative.

When asked why inmates were permitted wheelchairs with detachable arms, Rivero-Canchola said:

> "*Because I believe that the law requires us… to weigh the risks and benefits against the rights and needs of the inmates who are also patients who have medical needs. And* ***although there are some incidents that happen where inmates use medical equipment, including the arms and leg rests of wheelchairs and canes and crutches and walkers and all types of medical equipment as weapons, they're a drop in the bucket compared to the overall incidents at the jail.*** *So, while what happened to Mr. Clark is horrible, it's a terrible thing, and it should have never happened, it should be the responsibility of the person who did it… And we can't blame that on medical equipment. The inmates have the right to that medical equipment, and we cannot create more structural barriers for inmates with disabilities*

*because those things could possibly be used as weapons in the future. Jail is a dangerous place, but they still have rights while they are there*."

Rivero-Canchola said that she was not aware that there were wheelchairs available in which the arm swung open or downward without being detached so that a patient could move laterally.

**Wade Wicker**

Wicker had been employed with the Cook County jail as a corrections officer. Between December 2016 and June 2021, he worked as a corrections sergeant. He was then promoted to the rank of lieutenant.

Wicker reported that the RTU consisted of individuals who were there for psychological, medical, or detox reasons. Wicker said that the RTU consisted of both dormitory-style living and individual-cell style housing. The basement and first floor of the RTU building included the receiving section of the jail. Floors 3-4 and five housed RTU inmates and each of these floors had a combination of some single cell housing as well as dormitory housing.

According to Wicker, there were times when an inmate might be moved after making a threat against a corrections officer to a different section of the jail. He stated that there would be times when no action would be taken. He said that if inmates were already in the segregation unit, there would not be a higher security location to move those inmates.

Wicker said that's some inmates in the RTU or issued canes, crutches, or wheelchairs. However, **Wicker had never been involved in a meeting or discussion related to what types of canes, crutches, or wheelchairs could be allowed in the jail. Wicker could not recall another incident at the jail where an inmate had assaulted another inmate with any part of a wheelchair.**

Wicker admitted that he was the Sergeant assigned to the RTU during the assault on Mr. Clark. He stated that there would have been between three and five sergeants assigned to the facility with a minimum requirement of two sergeants being present during the midnight shifts. Wicker explained that corrections officers could call on the radio and request a break. They would refer to this as a *10-44* or *44.* Based on the contract with the employee union, the break should not last more than 15 minutes. Wicker agreed that there was at least one staff member assigned to the position of movement officer on each shift.

Wicker stated that it was a fair assessment to say that inmates have used many items that they have access to as weapons and that it was a concern of the sheriff's offices employees who worked in a jail. Nonetheless, **Wicker was not aware of any meetings with the Sheriff's Office in which the incident related to Mr. Clark was discussed including the topic of what could have been done differently or what steps could be taken to prevent such incidents in the future.**

Wicker had watched the surveillance video from the date of the incident involving Mr. Clark and he agreed that inmate Barksdale took possession offer wheelchair arm during a period when officer Perry left the tier unattended.

**<u>Kenya Deanes</u>**

Deanes reported having worked for Cook County for 29 years and currently holds the position of lieutenant. At the time of the incident involving Mr. Clark, Deanes was a lieutenant in the RTU, division 8.

**Deanes reported that the RTU held individuals who had been charged with domestic violence to murders and there was no prohibition on which types of criminal acts someone was charged with.** The inmates were mixed and housed in this section of the jail because they

had medical or mental health needs. **Deanes explained that there were approximately 80 cells in the building for detainees who were in some type of segregation confinement.**

Deanes explained that in addition to the corrections officers assigned to each of the housing areas, there was a roaming position known as the *movement officer*. The movement officer had various responsibilities including providing bathroom breaks and lunch relief for other officers. Additionally, the movement officer would assist in moving inmates for medical reasons or transportation to courts.

Deanes was asked about how officers supervised inmates in the dormitory-style units. Deanes said, ***"The officers that are assigned to RTU, their desk is on the dorm where the detainees are housed, and that's how they provide their coverage. They watch them because they're sitting on the deck with them."*** (*This statement complies with Policy 303 – Supervision of Inmates – Minimum Requirements -Section 303.1.1 Direct supervision*)

Deanes reported that there were no policies in place which required that the control officer who had access to monitor video cameras within the housing units had to watch the specific housing unit's cameras when the assigned officer took off for a break and left the unit unattended.

Deanes claimed no prior knowledge of any other incidents involving inmates being assaulted with parts from wheelchairs prior to Mr. Clark's incident. **According to Deanes, in the 29 years of being employed at the jail, Deanes could not recall a single instance when a wheelchair had been dismantled and used as a weapon against a detainee or a corrections officer.** Deanes stated there was no requirement for officers to log that they had taken a 44 (*break*). Deanes stated he did not know if officer Perry was granted a 44 prior to the incident, only that he was not on the tier when Barksdale removed the wheelchair arm.

**Martha Yoksoulian**

Yoksoulian started working for the Cook County Sheriffs office in 1995 and held positions as sergeant, lieutenant, captain, commander, and superintendent. She now worked as the director of the Quality Improvement and Accountability Department at the jail. At the time of the incident involving Mr. Clark, she had been working as the superintendent.

Yoksoulian stated: "*Every single incident or occurrence of something unusual would be made into an incident report, no matter how, you know, benign or how serious it is.*" She agreed that in inmate threatening another inmate or a corrections officer would require an incident report. (*This is inconsistent with the actual events involving Mr. Clark and Barksdale as the loud verbal argument between the two individuals was never reported or documented.)*

**Yoksoulian reported that she was not aware of other incidents in the past where inmates had used parts from wheelchairs to commit assaults on other individuals**. (*This is inconsistent with my review of the records from incidents dated May 20, 2018, and August 23, 2018, in which Yoksoulian was contacted following incidents when inmates had used parts from wheelchairs as weapons.*)

Yoksoulian was asked about an email (*CCSAO Clark versus Sheriff 5332 through 5333*) in which a sheriff's employee named Joseph Ryan had stated that wheelchairs had been a focus of concern over the years because they could be misused as weapons. Yoksoulian reported that she was not aware of any specific risks associated with wheelchairs and she had no knowledge of wheelchairs being a topic of focus for years. (*This is again inconsistent with the records which indicated two prior incidents involving wheelchairs in 2018 which were reported to Yoksoulian as the jail superintendent.)*

Yoksoulian was then presented with a document which was provided to plaintiff's counsel (*Clark Share 5390 through 5395*). The document was responsive to a request for production of

materials that indicated that Cook County jail inmates had used any part of a wheelchair to attack, assault, or batter another Cook County inmate between October 26, 2014, through January 31, 2020. The last incident found in this report was the incident involving Mr. Clark. The document showed 16 prior incidents before Mr. Clark's incident that occurred at the jail during the dates mentioned above. (*see Section V of this document*)

After reviewing the document, Yoksoulian agreed that all the incidents in the report involved wheelchairs in which inmates used pieces from wheelchairs to assault or batter another inmate. Yoksoulian was presented with a newspaper article published on March 14, 2017, and authored titled *Cook County's Inmates in Wheelchairs Face Challenges and Pose Risks in Jail* (*Yoksoulian deposition exhibit 7).* The article included a story of an inmate being viciously beaten by other inmates with parts from a wheelchair. Yoksoulian was informed that the incident took place in July 2016. She claimed to have no knowledge or recollection of this incident. She also could not explain why this specific incident from July 2016 was not included in the list of incidents involving inmates using wheelchairs to assault in the document that included all such incidents between October 26, 2014, through January 31, 2020.

**<u>Josiah Clark</u>**

Mr. Clark reported that he had previously been diagnosed with epilepsy and he had suffered from seizures in the past. He had a seizure a few weeks before he had been attacked by inmate Barksdale. However, that had been the first seizure he had experienced since 2018 and he went for a long period without having seizures.

Mr. Clark said that he has never been diagnosed with a mental illness. He reported that he was suffering mental and emotional damage because now he must wear a helmet all the time due to his brain injury and people say that he is slow. He stated that he was also depressed now because people made fun of him, and that he was not himself anymore. He felt like a different

person. He said that he was depressed even though he had never been diagnosed as depressed. He stated that he must use a cane now because he cannot walk right, and he has had an increase in seizures since the incident. He also reported that his head and his legs are not "feeling right." He says he cannot lie on the left side of his body, but he could not give an explicit reason why.

Mr. Clark recalled that earlier in the day when he was assaulted by Barksdale, he had witnessed Barksdale speaking with three other inmates about wanting to mess up handicapped people. Mr. Clark questioned Barksdale about why he wanted to do that to handicapped individuals. According to Mr. Clark, Barksdale and he exchanged words and Mr. Clark asked Barksdale if he wanted to step into the bathroom. Barksdale said no and that was the end of the incident at the time.

Mr. Clark said that he felt that since Barksdale was not handicapped himself, he felt that his proposed intention of messing with handicapped people was like pushing on a little, two-year old kid. Mr. Clark explained that asking Barksdale if he wanted to step into the bathroom was a challenge to fight. Mr. Clark said that he had become loud in confronting Barksdale and a corrections officer had heard the interaction[15]. According to Mr. Clark, the officer asked, "y'all cool?" Since Barksdale did not wish to fight, Mr. Clark responded that everything was okay. Mr. Clark had no other interactions with Barksdale prior to this.

## VIII. <u>DISCUSSION</u>

The Illinois Department of Corrections (IDOC) – Office of Jail and Detention Standards was established by Illinois State statute [*730 ILCS 5/3-15-2*]. The Jail and Detention Standards Unit is required to inspect each county jail on an annual basis [*730 ILCS 5/3-15-3*] for compliance

[15] No records were provided which showed that the verbal argument between Barksdale and Mr. Clark was documented by a corrections officer.

with the County Jail Standards. According to the IDOC[16], The purpose of monitoring is to develop standardized practices in detention facilities that enhance the health and safety of the public, detention staff and detainees. In addition, the Unit provides assistance and services to facilitate the development of those practices.

The IDOC maintains inspection documentation for all county jails in the state going back several years. The Cook County jail inspection is broken down into various divisions. For the purposes of my examination, I have only considered the inspections that took place at the Division 8 RTU section of the jail. **The following information was gathered from the inspection conducted on December 12, 2018**.

The report notes that Director Jeff Johnson was the superintendent of the facility at the time of the inspection. Tom Dart is noted as the Sheriff. On the date of the inspection, Division 8 RTU was at capacity with 979 individuals in custody. 644 of these were male and 226 were female. There were 228 male employees working as full-time staff and there were 99 female employees. Division 8 RTU has six dorm style tiers with 39 beds on each floor. The second floor of the unit has two tiers with 10 two-man cells. The third, fourth, and fifth floors each have two tiers with 10 two-man cells on each floor.

*Based on the above information, the RTU section of the jail had a total of 70 two-man cells available to place individuals who needed to separate from a dormitory style housing assignment.*

Under the heading – **701.20 – Personnel**, the inspection report asks the following questions.

- Are sufficient personnel assigned to provide 24 hour supervision of detainees?

[16] IDOC – Jail and Detention Standards Unit - *https://idoc.illinois.gov/aboutus/jailanddetentionstandards.html#:~:text=The%20mission%20of%20the%20Jail,Juvenile%20Justice%20Delinquency%20Prevention%20Act.*

- When each floor of detention has 15 or more detainees, is there one officer assigned to each floor?
- Do jail officers working in direct contact with detainees have a thorough knowledge of the personnel rules and emergency procedures of the jail which has been documented?

The inspection report noted an affirmative response to the above questions.

*The questions on the inspection report suggest that there was a mandate that the jail provides enough staff to provide round the clock supervision. When there were over 15 detainees in an area, an officer was required on the floor. This indicates that direct supervision was mandated in such environments. This is contrary to Perry's deposition statement in which he reported that there have been times when a single officer might have been required to watch multiple tiers at once.*

Under the heading – **701.30 – Records**, the inspection report asks the following question.

- Are extraordinary or unusual occurrences properly reported?

The inspection report noted an affirmative response to the above question.

*Based on the statements made by officer Perry, there was no requirement to report every incident. Perry said that there was no expectation to report events where inmates were raising their voice and yelling at each other. Perry's statements were also inconsistent with Yoksoulian's testimony in which she said that every single incident or occurrence of something unusual would be made into an incident report, no matter how benign or how serious it was.*

Under the heading – **701.70 – Classification and Separation**, the inspection report asks the following question.

- Is there a classification plan that specifies criteria and procedures for determining and changing the status of a detainee?

Under the heading – **701.130 – Supervision**, the inspection report asks the following questions.

- Are sufficient jail officers present in the jail?
- Is continuous 24-hour supervision provided in direct supervision housing?
- Are dormitories housing more than 25 detainees provided with continuous observation?

The inspection report noted affirmative responses to the above questions.

*Although the inspection report indicated that 24-hour supervision was being provided and dormitories with more than 25 detainees had continuous observation, the records in this case and statements made by staff in deposition testimony shows that Cook County jail customarily allowed officers to take breaks without having continuous observation in dormitory housing areas. Additionally, changes to classification and housing of individuals did not occur even though there were policies in place. Barksdale should have been removed from the housing unit after threatening staff, but he was not.*

Under the heading – **701.140 – Security**, the inspection report asks the following questions.

- Are backup personnel available when doors to living quarters are opened?
- Are glass and unsecured metal items prohibited in the detention area?
- Are detainees who present special security concerns checked more frequently than 30 minutes?
- Are tools and equipment inventoried and securely stored?
- Are eating utensils accounted for after each meal?
- Is damaged or nonfunctioning security equipment promptly repaired?

Under the heading – **701.150 – Safety**, the inspection report asks the following question.

- Are detainees prohibited from engaging in wrestling, contact sports, horseplay, or any activity likely to cause injury?

Under the heading – **701.160 – Discipline**, the inspection report asks the following questions.

- Do jail officers observing A disciplinary violation submit a written report?
- Do supervisory staff conduct a review of the factors of an alleged minor rule violation within 24 hours after its occurrence? Are detainees segregated as a result of a minor rule infraction informed by supervisory staff of the result of his or her review?
- Are penalties for minor rule violations limited to a reprimand or the loss of privileges or segregation for no more than 72 hours?

According to the report, the answer to each of the above inspection question was affirmative indicating that the facility was meeting established standards.

*The inspection report noted that detainees could be segregated because of a minor rule infraction, albeit for no more than 72 hours. This would suggest that a major rule violation involving the use of threats to kill a staff member should have warranted placement away from dormitory housing into a single cell housing for the safety and security of the facility.*

I also reviewed the IDOC report[17] from an inspection conducted on December 18, 2019. Debbie Boecker, the Director of Administration and Compliance, conducted the entrance and exit interviews with the IDOC personnel inspecting the jail. Karen Jones-Hayes was reported to be the jail superintendent during this inspection period. The population of Division 8 RTU was reported to be 810 on the date of the inspection. The answers to each of the questions from 2018 inspection continued to be affirmative and no changes were noted.

A review of the IDOC report[18] from an inspection conducted in December 2022, provided notes regarding the jail's classification unit. The following section is from this report:

---

[17] IDOC Inspection dated December 18, 2019. *https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/jds2017/2019-jail-inspections/cook-county.pdf*

[18] IDOC Inspection report dated February 1, 2023. Inspection conducted December 13 – 14, 2022.

- The classification office works in conjunction with all other areas of the facility to ensure appropriate housing placement of detainees. It is typically staffed with one lieutenant and 7 or 8 officers daily. Classifications are done upon intake and at least every sixty (60) days.
- **Considerations in the classification process include, but are not limited to, security level, gender, security threat group affiliation, ongoing investigation considerations, prior discipline, charged offense, physical stature, medical and mental health concerns, accessibility issues, Keep Separate From (KSF) designations, and changes and dispositions of pending cases.**

*In an objective classification process that is employed in most jails in the United States, inmates are classified based on various factors including the considerations related to the risks that the individuals pose because of their behavior, gang involvement, type of crime, prior incidents, etc. One of the considerations is medical and mental health concerns. Safety and security are almost always the primary factors that are considered in inmate housing. In the case of Cook County, the medical and mental health criteria appear to be given the highest priority even at the risk of ignoring known risks to safety and security.*

County staff have testified that they did not consider other alternative options for wheelchairs. Rivero-Canchola, the ADA compliance officer for the Cook County jail, said that she had considered a product by wheelchair manufacturer named *Merlexi* several years ago. The demo wheelchairs that a lieutenant tested broke immediately and they did not consider the product after that point.

---

https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/jds2017/2022-jail-inspections/Cook%20County.pdf

I conducted some research into Merlexi chairs through *Corrections.com* website. Corrections.com, established in February 1996, in an online global corrections community offering daily news and a comprehensive vendor intelligence database. Corrections professionals from all over the world connect through this website to discuss topics from policies and procedures to new corrections-related products.

I ran a query using the words "Wheelchair Security Issues" and found a forum where people were discussing the wheelchair product that was considered by Rivero-Canchola. The following is a review from one of the users on the webpage.[19],[20]

> *The Merlexi prison wheelchairs also seem to be a good durable wheelchair. We did have an issue at first with some foot rests failing right away on our small test batch. The problem appears to be related to a bad resin mixture in the batch. Merlexi responded right away by swapping out the defective parts which seems to have resolved the issue. I have not heard of any failures since. The plastic/resin material is similar to that of plastic shopping carts and does seem very durable and tamper resistant.*

A response by Merlexi appears on the forum and it states that the Merlexi chair comes with a 3-year guarantee, which the company stands by. Although there was an issue with the footrest breaking, all chairs were retrofitted with a new plastic formula that has proven durable across facilities without any reported cracks. Despite periodic communication with Kimberly Saucedo, who oversees the medical services bureau at Los Angeles County jail, there have been no adverse reports regarding the chairs' performance.

---

[19] http://buyersguide.corrections.com/forums/6/topics/254

[20] *The review is nine years old and the timing of the issue regarding breakage appears to be around the time that Cook County may have conducted its test on the product*

Through online searches, I reached out to Dr. Jane Hermes, president of Turbo Wheelchair Company, Inc. which makes the Merlexi chairs. I spoke with Dr. Hermes over the phone on March 25, 2024. The following information was gathered from my conversation:

- Merlexi is the only corrections-grade wheelchair in use today. More than 400 jails and prisons in the United States currently use Merlexi chairs. Many of these are federal correctional facilities.
- The chairs are also in use in mental health facilities and in VA hospitals.

## IX. MATERIALS REVIEWED

- DIV08-2019-7781_PG1 (1 page)
- DIV08-2019-7781_PG2 (1 page)
- DIV08-2019-7781 (1 page)
- 804 Jacorey Barksdale (20170411096) Incidents (Excel spreadsheet)
- 2022-05-19 CCSAO CLARK 1-152 (152 pages)
- 2022-08-26 Sheriff Int (7 pages)
- 5208-5327 Policies (119 pages)
- 5328-5387 CCSO 1-10 (60 pages)
- 5388 Div. 08-RTU, 3F Electronic Tier Log (Excel spreadsheet 6 tabs)
- Clark-Sheriff 005390-005395 - 2023.03.23 (6 pages)
- Clark-Sheriff 019303-019304 - 2023.04.03 (2 pages)
- Clark-Sheriff 019305-019333 - 2023.05.15 (29 pages)
- Clark, Josiah – CT (139 pages)
- Deanes, Kenya – CT (60 pages)
- Gavin, Larry – CT (37 pages)
- Gavin, Larry - Exhibit A (4 pages)
- Gavin, Larry - Exhibit B (2 pages)
- Gavin, Larry - Exhibit C (6 pages)
- Perry, Sheriff's Deputy Kardell – CT (145 pages)
- Perry, Sheriff's Deputy Kardell - Exhibit 3 (2 pages)

- Perry, Sheriff's Deputy Kardell - Exhibit 4 (2 pages)
- Perry, Sheriff's Deputy Kardell - Exhibit 5 (2 pages)
- PLTF 000107-000108 (DIV08-2019-7781 Incident Report Redacted) (2 pages)
- PLTF 000109-000160 (Jacorey Barksdale Documents Redacted) (52 pages)
- Rivero-Canchola, Sabrina – CT (52 pages)
- Rivero-Canchola, Sabrina - Exhibit 1 (3 pages)
- Rivero-Canchola, Sabrina - Exhibit 2 (8 pages)
- Rivero-Canchola, Sabrina - Exhibit 3 (2 pages)
- Wicker, Wade – CT (91 pages)
- Wicker, Wade - Exhibit 1 (2 pages)
- Yoksoulian, Martha – CT (53 pages)
- Yoksoulian, Martha - Exhibit 1 (3 pages)
- Yoksoulian, Martha - Exhibit 2 (2 pages)
- Yoksoulian, Martha - Exhibit 3 (2 pages)
- Yoksoulian, Martha - Exhibit 4 (2 pages)
- Yoksoulian, Martha - Exhibit 5 (3 pages)
- Yoksoulian, Martha - Exhibit 6 (6 pages)
- Yoksoulian, Martha - Exhibit 7 (16 pages)
- 249-1145 Barksdale File (898 pages)
- DOC 59 - 4th Amended Complaint (10 pages)

**Videos:**

- 3-035-3POD-6NW_2019-06-09_00h27min00s000ms (3:01 minutes)
- 3-036-3POD-6NE_2019-06-09_00h27min00s000ms (3:01 minutes)
- MVI_0253 (1 minute)
- MVI_0254 (0:21 minute)

**Independent Research:**

- Corrections.com – Forum related to Merlexi Wheelchairs. *http://buyersguide.corrections.com/forums/6/topics/254*
- IDOC – Jail and Detention Standards Unit - *https://idoc.illinois.gov/aboutus/jailanddetentionstandards.html#:~:text=The%20mission%20of%20the%20Jail,Juvenile%20Justice%20Delinquency%20Prevention%20Act.*

- IDOC Inspection dated December 18, 2019. *https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/jds2017/2019-jail-inspections/cook-county.pdf*
- IDOC Inspection report dated February 1, 2023. *https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/jds2017/2022-jail-inspections/Cook%20County.pdf*

## X. OPINIONS AND RATIONALE

After careful examination of the evidence and circumstances that are known in this matter, I formed several opinions regarding this case, which I hold to a reasonable degree of professional certainty. These are my opinions thus far and I reserve the right to change them and/or supplement them if presented with new facts or additional information regarding this case. My opinions are not meant to invade the role of the factfinder(s) to determine the ultimate issues in this case.

**Opinion 1: Cook County Sheriff's Office and the staff working at the Cook County jail facilities were aware of the serious concerns related to inmates misusing wheelchairs and tearing up parts to make weapons and using such parts to carry out assaults on others. Staff in executive positions at Cook County testified that they had no knowledge about the severity of the issue and even claimed that they were unaware of the numerous incidents involving wheelchairs and inmates using these devices as weapons. Steps were not taken to mitigate the risks even after having years of data and information regarding the misuse of wheelchairs by inmates. Although the facility had an ADA Compliance Officer, the individual did not follow policy in considering the risks posed by the continued use of the unsafe wheelchairs or recommending a change in procedures that would have allowed for a safer operation of the jail. The failure of the Cook County Sheriff's Office to implement a policy that precluded the use of wheelchairs that could be dissembled into weapons, despite**

**the prior incidents in which the parts were used as weapons and the high risk created by the lack of such a policy was obvious, exhibited an indifference to the needs of the detainees and was the moving force behind Barksdale's use of a wheelchair arm to attack Plaintiff.**

Prior to the incident on June 19, 2019, were inmate Barksdale attacked Mr. Clark with a part that he stole from the wheelchair belonging to another inmate, the Cook County jail's Division 8 RTU had a long history of inmates using wheelchairs as weapons.

Section V of this report includes 17 incidents between May 30, 2015, and June 9, 2019. This equates to approximately four incidents per year where inmates in the RTU used pieces from a wheelchair as weapons to assault other individuals. The information regarding these incidents came from a document produced by the County in response to this lawsuit. (*Clark-Sheriff 005390-005395 – 202*)

A news article published in the Chicago Sun Times on March 14, 2017, exposed the conditions inside the Cook County jail and described how wheelchairs were being used as weapons by inmates. The article described a severe beating suffered by an inmate with parts from wheelchairs that were turned into weapons. Another inmate was bludgeoned and sent to the hospital with a head injury. The attackers were gang members whereas the victim was not in a gang.

The attack described in the news article did not appear in the county records. This leads to the possibility that there may be more than 17 reported incidents over the four years that were either not recorded properly or information was somehow lost.

Former superintendent Yoksoulian could not recall incidents where inmates had been attacked with wheelchair parts even though the records show a seriously high number of individuals impacted by such attacks. Yoksoulian was involved in two of the prior incidents

where she was contacted following the attack on inmates. Yet, she maintained that she was largely unaware of the problem.

The email communication by Mr. Joseph Ryan, Executive Director of Cook County Sheriff's Office, makes it clear that high-level administrators were aware of the instances where wheelchairs were being used for weapons. Staff reported during deposition testimony that there had been no meetings or discussions to consider alternatives to the current wheelchairs or a change in procedure to look for safer ways to manage the inmate's ability to dismantle the equipment.

Per policy (*Policy 148 – Communication and Interaction with Individuals with Disabilities*), the ADA Compliance Officer was responsible for identifying concerns related to ADA compliance, including issues regarding accessibility and safety for mobility-impaired individuals. It was within the scope of the ADA Compliance Officer's function to recommend reasonable modifications to policies and procedures to address concerns related to ADA compliance and ensure the safety and security of all individuals, including inmates with disabilities. This included having knowledge of potential threats posed by equipment such as wheelchairs being dismantled or modified to be used as weapons and proposing changes to policies and procedures to enhance safety and security in such situations.

ADA Compliance Officer Rivero-Canchola implied that there were legal requirements to consider the rights and needs of inmates, particularly those with medical needs, when making decisions about accessibility aids such as wheelchairs with detachable arms. Even though she acknowledged that incidents involving the misuse of medical equipment, including detachable wheelchair arms, do occur, she considered the issue to be one where the agency had to weigh the risks versus benefits because she felt that the number of wheelchair related assaults were relatively rare compared to the overall incidents within the jail.

The approach by Rivero-Canchola and others in Cook County is severely problematic because unlike a private company selling products making cost-benefit decisions, a public safety agency must consider the risks to individuals in a more deliberate manner. Chalking it up to the consequences of inmates having wheelchairs in a correctional setting is not the appropriate approach.

In my opinion, the Cook County Sheriff's Office, through Sheriff Dart, failed to make a policy allowing only correctional-facility safe wheelchairs to remedy this known and potentially dangerous practice of allowing wheelchairs into the jail that detainees were easily able to dissemble and use as weapons. The Cook County Sheriff's Office was on notice that, without implementation of such a policy, detainees would continue to use the detached wheelchair parts as weapons against other detainees, thereby causing the Sheriff's Office to fail to protect the safety of the detainees in their custody. The Sheriff's Office's failure to create this policy could be characterized as a deliberate indifference to the rights of the detainees in their custody in two ways. First, the Sheriff's Office was on notice of the harms created by the lack of such a policy due to the high number of prior incidents in which wheelchair parts were used as weapons against detainees. Second, the risk that a detainee would use the easily detachable wheelchair part as a weapon was so high that it was obvious to all. Finally, the Sheriff Office's failure to implement such a policy allowed Barksdale to dissemble the wheelchair belonging to the other detainee and attack Plaintiff as he slept, thus causing the harm to Plaintiff.

**<u>Opinion 2</u>: Cook County allowed the custom and practice of permitting corrections officers to abandon their direct supervision housing units while they took breaks without having proper relief in place. Officers were asked to watch more than one unit at a time by standing outside in the hallways even though there was a mandate to never allow a housing**

**unit with over 25 detainees to be left unsupervised. The requirement for continuous observation was not followed, creating an unsafe environment at the jail.**

**As a result of the customary practice of permitting officers to take small breaks or leave the housing unit unattended, Officer Perry left his post unattended for several minutes and took breaks on the night of the attack on plaintiff Mr. Clark. During one of these absences, inmate Barksdale was able to remove a wheelchair arm from another inmate's chair and hide it under his sheets on his bed. The item was subsequently used in the attack on Mr. Clark.**

Departmental Policy 303 mandated that sworn members must not leave their assignments unless properly relieved while inmates were present. This policy aimed to ensure continuous supervision of inmates and prevent conflicts between staff duties and inmate supervision. Based on the policy, it's evident that Cook County jail had specific requirements for direct supervision over inmates in certain sections of the jail, particularly where the dormitory population exceeded 25 inmates. Direct supervision was mandated for sections of the jail where the dormitory population exceeded 25 inmates. This supervision required continuous observation by a sworn officer during the midnight shift, with direct visual and oral contact with the inmates under their supervision. This meant that reliance on video surveillance alone was not sufficient.

The policy prohibited officers from being assigned duties that conflicted with the supervision of inmates. This included leaving the direct supervision post unattended for tasks such as fetching paper for the printer, picking up microwaves, or taking bathroom breaks while leaving the unit unattended. Items such as moving microwaves or picking up paper from the printer could be accomplished using other staff who worked on mobile positions or even with the aid of a sergeant or lieutenant. There is simply no reasonable explanation for allowing a high security

unit to be left unattended with inmates having access to countless items that could be fashioned into weapons.

Despite the policy's requirements, the deposition statements reviewed indicated that officers were routinely allowed to leave their direct supervision posts for various reasons, including fetching papers or taking bathroom breaks. This suggests a custom and practice and a deviation from the established policy and raises concerns about the adequacy of supervision in the affected areas of the jail.

First Assistant Executive Director Larry Gavin reported that direct supervision required continuous monitoring of inmates on a 24-hour basis. Policy 303 prohibited sworn members from being assigned duties that conflicted with the supervision of inmates. However, Gavin admitted that there were instances where sworn members were assigned duties that took them away from their assigned posts, such as assisting with searches on other tiers, resulting in specific inmate dormitories being left unsupervised. Officer Perry's statement regarding this practice was consistent with Gavin's testimony.

While Gavin acknowledged that Policy 303 established governance, he also admitted that operational variances were allowed in practice. These variances were not explicitly outlined in the policy itself, indicating a potential gap between policy requirements and operational realities. Overall, the information provided highlights discrepancies between the stated policy requirements for direct supervision in Cook County jail and the observed practices of the officers. Failure to adhere to these policies had implications for inmate safety and security within the facility as evidenced in this case with inmate Barksdale using the opportunity when the unit was left unattended to go and steal a piece from an inmate's wheelchair that he subsequently used as a bludgeoning weapon against Mr. Clark.

Perry's admission that he left the tier five times, totaling approximately 20 minutes, after being shown the surveillance video from the night of the incident is significant. It indicates that there were extended periods during which Perry was not present on the tier, potentially leaving inmates unsupervised or inadequately supervised. Furthermore, Perry's admission that he was not on the tier at the time Barksdale removed the arm of a wheelchair and placed it on or near his bed raises concerns about the lack of supervision during critical moments. This incident highlights a lapse in monitoring, allowing for potentially dangerous actions to occur without immediate intervention or oversight.

**Opinion 3: Cook County jail failed to follow sound corrections practices through proper classification methods. Classification processes used at the jail did not consider risk factors when mixing inmates with various levels of criminal backgrounds and criminal sophistication into a single housing unit. This was done to consolidate inmates with medical and mental health issues all into fewer sections of the jail. This practice is not practical because it created failures in inmate classification and contributed to the attack on Mr. Clark.**

**Cook County Classification Unit also failed to appropriately remove inmate Barksdale from the dormitory-style housing area as he was scheduled to be placed into a segregated cell on June 8, 2019, after he threatened to kill a corrections officer. This move in housing never took place. Had he been moved to an appropriate location away from Mr. Clark, he would never have had the opportunity to carry out the vicious attack on Mr. Clark.**

The information provided by Lieutenant Kenya Deanes and Officer Perry highlights several important aspects of the Residential Treatment Unit (RTU) at the jail. Deanes reported that the RTU housed individuals charged with a wide range of offenses, from domestic violence to murder. There was no prohibition on the types of criminal acts for which someone could be

housed in the RTU. Inmates were mixed and housed in this section based on medical or mental health needs rather than the severity of their charges.

Perry indicated that not all inmates in the RTU had physical or mental disabilities. Some had injuries, while others had no injuries at all. This suggests that the RTU catered to a diverse range of needs beyond just medical or mental health issues. Perry also mentioned that inmates charged with serious crimes like murder could be housed alongside those charged with minor offenses in the RTU. This mixing of inmates, regardless of the severity of their charges, was common practice in both cell and dorm settings within the RTU.

It is never a good idea or sound correctional practice to place violent offenders in the same housing unit as non-violent offenders. Inmates or detainees being held for minor crimes such as driving while intoxicated should not be housed on a permanent basis with individuals charged with rape or murder. This practice of separating individuals based on risk factors is widely accepted in correctional facilities across the United States.

Based on the information provided, it seems that in Cook County, medical and mental health concerns are given priority in inmate housing decisions, potentially at the expense of safety and security considerations. This prioritization may differ from the approach employed in many jails across the United States, where safety and security are typically the primary factors considered in inmate housing decisions.

In an objective classification process, various factors are typically considered to determine the appropriate housing placement for inmates. These factors may include the risks posed by the individual's behavior, gang involvement, the type of crime they are charged with, prior incidents, and any medical or mental health concerns.

While medical and mental health considerations are certainly important in ensuring the well-being of inmates, they are typically weighed alongside safety and security concerns. However, if

Cook County appears to prioritize medical and mental health criteria above safety and security considerations in inmate housing decisions, leading to situations where known risks to safety and security were ignored. This had serious implications for the overall safety and stability of the facility, as well as for the well-being of both inmates and staff as evidenced by the numerous incidents of inmates using wheelchair parts as weapons against others.

Inmate Barksdale had a long history of behavioral and conduct issues prior to his attack on Mr. Clark. Classification records identify him to be a maximum custody inmate. On the day prior to Barksdale attacking Mr. Clark, he had already made threats to kill a corrections officer. The officer had filed charges and a record of this was sent to Superintendent Yoksoulian on June 8, 2019. The inmate disciplinary code for Barksdale's actions showed that a threat made to an employee was a level 3 charge and violation of code 320.

Classification documentation from June 8, 2019, indicated that he was to be placed into a "House Alone- Out Alone" status from June 8, 2019, through June 22, 2019. This did not occur. This failure by Classification to move Barksdale despite knowledge of the severe threat that he posed directly contributed to his remaining in the housing unit where he was free to carry out the attack on Mr. Clark only a few hours later.

**<u>Opinion 4</u>: The classification process at the Cook County jail places an enormous level of priority on recommendations made by Cermak in making housing decisions. By abdicating other very important factors in housing and classification decision-making, the facility has ignored known risks and ongoing threats from very dangerous individuals in the name of complying with ADA standards. This approach to compliance with ADA standards is flawed because many individuals who use wheelchairs are forced to deal with others who will commandeer parts from the wheelchairs to use as weapons.**

Procedure 705 indicated that classification staff could consider substantial safety or security concerns and consult the ADA Compliance Officer for guidance. Additionally, classification staff were responsible for maintaining a list of cells and living units suitable for disabled inmates. Based on these procedures, steps could have been taken to address the issue of wheelchair-related attacks. This could include considering the placement of inmates with wheelchairs in cells or living units where they would be safer from potential threats, as well as ensuring that inmates who posed a threat due to their behavior were placed away from individuals with disabilities to prevent the use of their equipment as weapons.

Based on Procedure 705 and the responsibilities outlined for classification staff, several steps could have been taken to address the issue of wheelchair-related attacks and enhance the safety and security of inmates with disabilities. Classification staff could have consulted the ADA Compliance Officer regarding substantial safety or security concerns related to inmates with disabilities, including the risk of wheelchair-related attacks. The ADA Compliance Officer should have then provided guidance on modifying policies or procedures to mitigate these risks effectively.

Classification staff were responsible for maintaining a list of cells and living units suitable for disabled inmates. This list could have been utilized to identify living units where inmates with wheelchairs would be safer from potential threats. Cells or living units with better supervision, fewer incidents of violence, or other protective measures could have been prioritized for placement of mobility-impaired inmates. This would have prevented disabled inmates with wheelchairs from having to be deprived of their mobility equipment because other inmates were taking parts off these items to use as weapons. As with this case, inmate Barksdale himself did not have a disability related to mobility. He actively sought out someone else's wheelchair that he dismantled without the individual's permission and took it off the wheelchair leaving the

individual unable to use the equipment when he required it. Classification staff could have taken steps to ensure that inmates who posed a threat due to their behavior were placed away from individuals with disabilities. This could prevent the use of equipment belonging to disabled inmates as weapons. By separating potentially dangerous individuals from vulnerable populations, the risk of wheelchair-related attacks could be significantly reduced.

______________ End of Section ______________

Thank you for allowing me the opportunity to work on this matter. Please let me know if you any questions regarding my report.

Respectfully submitted,

______________________
Lenard Vare

**QUALIFICATIONS AS A CORRECTIONS CONSULTANT AND EXPERT**

My background and qualifications are set forth in the CV attached to this report. I highlight some of that material that I believe is particularly relevant to my review and evaluation of this case. My opinions are based in part on my training, professional experience, and education. I have more than 26 years of experience in corrections.

I have been involved in training correctional officers, conducting internal affairs investigations, and operating correctional facilities at both the local level and in a prison setting. Additionally, I have been involved in training staff in probation departments and sheriff's departments and aiding various agencies in the development of policies and procedures.

I started my career working in corrections at the Claremont Custody Center in Coalinga, California in 1992 where I worked as a correctional officer. I was promoted to the position of correctional sergeant and was in-charge of managing a 450-bed medium custody prison, which was operated by the City of Coalinga under a contract with the California Department of Corrections. As an officer I was also involved in the corrections officers' union and served as the president of the local chapter of PORAC (Peace Officers Research Association of California). In this role, I engaged in union negotiations and representing employees during disciplinary proceedings.

I began working for the State of Nevada, Department of Corrections (NDOC) in 1995 as a correctional officer. I worked with inmate fire crews assigned to wild-land firefighting under a contract with the Nevada Division of Forestry. I was promoted to the position of sergeant and then lieutenant and worked in multiple prisons with increasing levels of responsibility.

During my career, I conducted training on various topics including courses on Interpersonal Communications, Use of force, Inmate Classification, and Inmate Programs. I taught various courses in corrections and inmate management at the POST academy for Nevada corrections

officers. I served as SERT commander and was part of the Hostage and Crisis Negotiation team for the department. I received training from the Las Vegas Metropolitan Police Department and the National Institute of Corrections on SERT and emergency response teams. I received training in hostage negotiations and crisis management with the Federal Bureau of Investigations. I also trained staff in ethics, professional responsibility and conduct, report writing, and managing critical incidents.

Over the course of my career with NDOC, I oversaw numerous emergencies in the role of facility commander. These emergencies included handling critical incidents such as fires, riots and other mass disturbances, hostage and other critical incidents, officer involved shootings, escapes, inmate assaults, major gang fights, inmate suicides and deaths in custody.

I was promoted to the role of Corrections Manager and was responsible for the operation of the only reentry facility in the State of Nevada. Subsequently, I was appointed to the position of Warden by then Governor Kenny Guinn in 2004. I managed the operations over three major institutions during my term as warden. As warden, I was responsible for the entire operations of the correctional institution. My duties included overseeing staff management, emergency operations, overseeing policies and procedures, ensuring contract compliance with program and service providers, managing the oversight of prison hospital and medical facilities, overseeing fire and life safety processes, and ensuring the proper care and custody of all inmates assigned to each of the correctional institutions.

Over the next four years, I managed a women’s prison, a men’s medium/maximum institution along with a sex offender unit, and a youthful offender facility. I also oversaw the operations of three minimum custody fire camps and a regional transitional housing facility located in Las Vegas, NV. I have served on the executive team overseeing executions on death row and other specialized teams such as the investigations unit and fugitive apprehension teams.

In 2008, I moved to California after accepting a position as the Director of the Napa County Department of Corrections. Napa County is one of only two counties where the corrections function is separated from the Sheriff's office and the department head reports directly to the County Board of Supervisors. In this role, I served as the facility commander and was responsible for all facets of the running of the county jail. I also functioned as the chairperson of the County Parole Board and had oversight over the disciplinary and classification process in the jail. I retired in May 2018 from Napa County.

I then began working as the Executive Director over a company that provided alternative sentencing programs, treatment and employment services for justice-involved persons, electronic monitoring, and day reporting centers under contract with various government agencies. I was promoted to the Chief Operations Officer of the parent company which was a publicly traded international organization and worked in that role until February 2020.

Between 2020 and 2021, I served as an investigator for the California State University, Sacramento campus conducting personnel and Title IX investigations in an interim role with a one-year limited term.

I possess a bachelor's degree in criminal justice administration and a master's degree in justice management. I am a certified jail manager (CJM) through the American Jail Association and a certified project manager (PMP) through the Project Management Institute.

I have completed the Nevada Category III POST academy, the California POST (PC 832) course and the California Standards and Trainings in Corrections (STC) academy. I have attended various trainings in inmate management as well as attended conferences with the National Institute of Corrections, American Jail Association, American Corrections Association, and the California State Sheriff's Association. I completed my corrections training through the San Joaquin Valley College in 1991 in Fresno, CA.

In my role as the department head over Napa County Department of Corrections as well as warden with the Nevada Department of Corrections, I have been involved in several lawsuits related to Religious Land Use and Institutionalized Persons Act (RLUIPA), deaths in custody, use of force, inmate medical issues, and classification and management of inmates.

I served as the Vice President of the California Jail Programs Association between 2012 and 2014 and as a board member on the Napa Valley Crime Stoppers organization. I was a past member of the International Association of Chiefs of Police during my tenure as a warden with NDOC. I am regularly involved in local criminal justice issues and attend meetings at the Board of State and Community Corrections and have served on various committees and work groups. I was formerly involved in both the Northern California Jail Manager's (NCJM) and Bay Area Jail Manager's (BAJM) Associations and regularly participated in the Detentions and Corrections Subcommittee meetings at the California Board of State and Community Corrections.

As a member of the California Jail Programs Association and through my participation in NCJM and BAJM, I attended training and conferences involving practices and programs in various jails throughout the State of California. These trainings have allowed me to tour dozens of facilities including San Quentin State Prison, Folsom State Prison, Los Angeles County Jails, and jails in Sonoma County, Solano County, Alameda County, Contra Costa County, San Francisco County, Placer County, Fresno County, San Diego County, Riverside County, Orange County, Santa Cruz County, Marin County, and San Mateo County. I have participated in several training courses where agencies have described innovative programs and processes that they use to manage their jails and prisons.

I have also served as an instructor and trainer in criminal justice and corrections. In 2010, I began working as an Adjunct Professor at the University of Phoenix, Sacramento region and have taught over thirty-two courses in criminal justice. I have also guest lectured at the

University of Nevada, Reno, University of Nevada, Las Vegas and Sierra College in Rocklin, CA in law enforcement and corrections related courses. I have provided department wide trainings to the Fresno County Probation Department, Fresno County Sheriff's office, and the San Joaquin Sheriff's office on issues related to realignment and changes in inmate profile within California jails.

I have provided training to probation agencies in Riverside, Santa Clara, Marin, San Francisco, San Mateo, Alameda, Solano, Siskiyou, San Benito, Lake, and Placer County. I have provided training sessions on preventing jail and prison suicides, inmate management, critical incident reviews, and other topics to various agencies.

**<u>Published Materials:</u>**

Elephant Keepers: Reflections of a Prison Warden. Published November 13, 2023. ISBN: 979-8867609245.

Vare, L. (2014, November). Of Elephants and Men. American Jails, 28(5), p35 -39.

Vare, L. (2015, September). Manipulation Revisited. American Jails, 29(4), p31-36.

*Jails and the Mentally Ill. A briefing paper* – Council on Mentally Ill Offenders (2010). *Served on the team with California Corrections Standards Authority which developed a white paper on the status of mentally ill offenders in California's jails.*